## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANTHONY DAVID ALE SMITH | : | NO. 20-368-03 |

## DEFENDANT'S SENTENCING MEMORANDUM

**TO THE HONORABLE JUAN R. SANCHEZ, JUDGE OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA:**

Anthony David Ale Smith, by and through his attorney, Paul J. Hetznecker, Esquire, files the Sentencing Memorandum in the above captioned matter and submits the following in support thereof:

## I.    PROCEDURAL HISTORY

On October 27, 2020 Anthony David Ale Smith was arrested based on an Indictment issued by a grand jury sitting in the Eastern District of Pennsylvania charging him with on 18 U.S.C. § 844(1) and (2) (arson of property belonging to an agency receiving federal funding - 1 count); 18 U.S.C. § 844(i) (arson affecting interstate commerce - 1 count); 18 U.S.C. § 231(a)(3) (obstruction of law enforcement during a civil disorder - 1 count) 18 U.S.C. $ 2 (aiding and abetting). The Indictment alleges that on or about May 30, 2020 in Philadelphia, PA Mr. Smith maliciously damaged and destroyed,

attempted to damage and destroy and aided and abetted the destruction, by means of fire, of Philadelphia Police Department Car C-109, a vehicle owned by the Philadelphia Police Department. Following a detention hearing Mr. Smith was released on house arrest. Mr. Smith remained on house arrest for two years and seven months prior to Your Honor's order removing house arrest restrictions following his entry of a guilty plea in June.  On June 7, 2023, pursuant to a plea agreement, Mr. Smith entered a guilty plea to obstruction of law enforcement during a civil disorder. Sentencing is currently scheduled for November 28, 2023.

## II.    <u>OBJECTIONS TO THE PRESENTENCE REPORT</u>

The following objections to the Presentence Report are submitted on behalf of my client Anthony Smith. According to the revised PSI dated November 20, 2023, paragraph 32, Mr. Smith meets the criteria set forth in USSG Section 4C1.1(a)(1)-(10) and is a zero point offender and should be reduced by two levels, moving the offense level to 19.

**Objection 1**: The first objection is to the first page reference to co-defendants. Although Mr. Smith was charged in the same indictment with two others, they were not charged as co-conspirators. Each individual charged in the indictment acted on their own.

**Objection 2**: The second objection is to paragraph 17 of the report. In the report there is a factual allegation that Mr. Smith on two separate occasions threw a piece a paper into the police vehicle that was already engulfed in flames. This is inaccurate. According to the

expert report submitted to the government, the probation department, and now to Your Honor, (Exhibit 1, Expert Report by Carpenter) it is clear from the photographs taken at the time of the incident that Mr. Smith threw only one piece of paper/cardboard into the vehicle that was already engulfed in flames.

**Objection 3**: The next objection is to paragraph 19. The quote taken from Anthony Smith's social media posts is taken out of context. He is not threatening violence, just the opposite, he is responding to the violence leveled against the Black community.

**Objection 4**: The next objection is to paragraph 21. Counsel objects to the assertions in this paragraph by Deputy Commissioner Dales that criminal mischief and the looting of the businesses immediately adjacent to City Hall occurred prior to Mr. Smith's involvement in overturning the Philadelphia Police vehicle. Actions by others unrelated to overturning the Police vehicle were spontaneous, independent actions and not connected to or in concert with the actions by Mr. Smith. The conclusions asserted by Deputy Commissioner Dales regarding the impact of Mr. Smith's actions are offered as an opinion and not based on the dozens of videos and hours of review by Counsel of the hundreds of independent actions committed by others on that day. Furthermore, Deputy Inspector Dales' speculative conclusions regarding the impact of one event on another involving thousands of individuals and their own separate decisions should be stricken from the Presentence Report. Such unsupported speculation is antithetical to our system of justice whereby individuals are responsible for their conduct and not the independent decisions of others.

**Objection 5**: On behalf of my client, I object to paragraph 26. The appropriate guideline range is not connected to the arson of the vehicle since the expert report prepared by Mr. Carpenter submitted to the Probation Department clearly establishes that the single piece of cardboard/paper placed into the fire by Anthony Smith did not contribute to the fire as at the time he placed the cardboard/paper into the vehicle the fire was raging and had already engulfed the police vehicle. As reflected in the expert's report, at the point in time Mr. Smith placed the piece of paper/cardboard into the flames the fire was fueled by oxygen and not small combustible materials. (See Exhibit 1, Expert Report by Carpenter) The appropriate guideline range applicable to Anthony Smith's actions in overturning a police vehicle is found at Guideline Section 2A2.4- Obstructing or Impeding Officers. The base level is 10. If the offense involved physical contact; or a dangerous weapon (including a firearm) was possessed and its use was threatened, increase by 3 levels. In this case Anthony Smith, in helping to overturn a police vehicle and placing a piece of cardboard/paper into a vehicle engulfed in flames did not include physical contact with a police officer, and did not include possession of a dangerous weapon in which use was threatened. Therefore, the applicable base level for this offense is 10 and not 24.

**Objection 6**: The same objection as the previous paragraph.

**Objection 7**: This objection applies to paragraph 31. Applying the correct guideline section for the conduct engaged in by Mr. Smith, Section 2A2.4, the adjusted base offense level with acceptance of responsibility should be 7, not 19. (See Updated Presentence

Report).

**Objection 8**: This objection applies to the overall guideline range. The PSI indicates that the guideline range is 30-37 months incarceration based on the arson guidelines. The guideline range for Mr. Smith based on Obstructing or Impeding Officers is 0-6 months incarceration.

## III.    DETERMINING THE APPROPRIATE SENTENCE

In United States v. Booker, 125 S. Ct. 738 (2005), the United States Supreme Court held that the Sixth Amendment right to a jury trial prevented judges from fact finding that expose a defendant to increased prison time. The Supreme Court excised the provision of the Sentencing Reform Act that made the guidelines mandatory and rendered the Sentencing Guidelines "effectively advisory." Booker, 125 S. Ct. at 757.  The Supreme Court found that the lower courts must consider the sentencing guideline range as one factor among many factors as set forth in Section 3553(a). Kimbrough v. United States, 128 S. Ct. 558 (2007); Gall v. United States, 128 S. Ct. 586 (2007).  In order to accomplish this purpose, the sentencing court must consider the factors as set forth in 3553(a). The guiding principle when applying these factors under Section 3553(a) is to "impose a sentence sufficient but not greater than necessary, and to comply with the purposes set forth in Paragraph 2." Section 3553(a) (2)  which states that such purposes are:

(a)    To reflect the seriousness of the offense, to promote respect for the law, and to provide for just punishment for the offense:

(b)    To afford adequate deterrence to criminal conduct;

(c)  To protect the public from further crimes of the defendant; and,

(d)  To provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In <u>United States v. Rita</u>, 125 S. Ct. 2456 (2007) the Supreme Court made it clear that the district court may ignore the guidelines and impose a completely different sentence than that which is recommended. The Supreme Court has essentially freed the district courts to disagree with the policy  decisions of Congress or the Sentencing Commission set forth within the guidelines. Following the Supreme Court's decisions in <u>United States v. Booker</u>, supra., <u>United States v. Rita</u>, supra., <u>Gall v.  United States</u>, supra., and <u>Kimbrough v. United States</u>, supra., a sentencing court may now consider a defendant's age, education and vocational skills, or lack thereof, mental, or emotional condition, physicalconditions including drug and alcohol addiction, employment record, family ties and responsibilities andthe lack of supervision and/or guidance as a young person. The guidelines previously prohibited the sentencing court from considering these factors, unless the situation was so exceptional that it was deemed to be "outside the heartland" of the cases generally seen by the court. Although the departures under the guidelines still require extraordinary circumstances post-<u>Booker</u>, this is distinguished from variances which have no relationship to the unusual circumstances that may be granted when departures are not only unwarranted, but prohibited. <u>United States v. Severino</u>, 454 F.3d 206 (3rd Cir. 2006): <u>Gall v. United States</u>, supra.

In both <u>United States v. Cooper</u>, 437 F.3d 324 (3rd Cir. 2006) and <u>United States v. Gunter</u>, 462 F.3d 237 (3rd Cir. 2006), the Third Circuit established the procedure for sentencing hearings. Before fashioning the sentence the district courts must calculate the guideline range, factoring in any objections, rule on any departure motions made pursuant to the guidelines, and then impose a sentence in light of all the relevant 3553(a) factors. The procedure as established in <u>United States v. Gunter</u>, supra., requires courts to then consider all of the factors as set forth in the record under Section 3553(a), and provide a meaningful analysis of those factors as a basis for imposing the sentence. <u>United States v. Grier</u>, 475 F.3d 556 (3rd Cir. 2007), <u>United States v. Tomko</u>, 562 F.3d 558 (3rd Cir. 2009)

## IV.    <u>MOTIONS FOR DEPARTURE AND VARIANCES</u>

There are no Motions for Departure in this case. However, on behalf of Mr. Smith there are several grounds that support a downward variance.

## V.    <u>SENTENCING FACTORS</u>

Prior to fashioning the appropriate sentence, one that is "not greater than necessary," we respectfully request that Your Honor consider the factors set forth below under each subsection of Section 3553(a)

### A.    **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

As the Third Circuit has noted, downward variances have nothing to do with downward departures based on extraordinary circumstances, and may be granted when

departures are not only unwarranted but prohibited. United States v. Severino, 454 F.3d

211 (3rd Cir. 2006).

On behalf of Mr. Smith, we respectfully request a downward variance based on the

following grounds.

The first argument in support of a downward variance is based on aberrant behavior.

As reflected in the Presentence Report, the Probation Department indicates that Mr. Smith

may be eligible for a downward departure under USSG Section 5K2.20, for aberrant

behavior as this was an extraordinary moment in our history. May 30, 2020 reflected a

single incident that was "committed without significant planning, was limited in duration,

and represents a marked deviation by the defendant from an otherwise law-abiding life."

(See PSI par. 102-103). Similarly, the Probation Department writes that these facts form the

basis for a possible downward variance. The Probation Officer writes, "Not only was the

defendant's conduct aberrant but the circumstances surrounding it were as well. The

defendant has established a reputation of charity, service, and peaceful advocacy. The

inexcusable conduct he exhibited on May 30, 2020, cannot be fairly assessed unless

examined through the lens of outrage and tension that gripped the nation at the time. It is

unlikely the defendant will repeat his conduct for several reasons, including that the riots

occurred in the wake of the George Floyd murder, historically significant, and unlikely

duplicated." ( PSI par. 103-105).

The ten -day period following the murder of George Floyd was an extraordinary and

tumultuous time in history of this country. Studies show that the anger, sadness, and depression among the black population increased dramatically after the killing of George Floyd, recorded, and subsequently witnessed by millions of Americans. The Emotional and Mental Health Impact of the Murder of George Floyd on the U.S. Population, Johannes C. Eichenstaedt, Garrick T. Sherman, Salvatore Giorgi, Sharath Chandra Guntuku, Psychological

The study noted that police brutality against Black Americans places Black Americans at disproportionate risk for reduced mental health, both reflecting and reinforcing US racial inequality. In addition, the researchers found that in the week following the murder of George Floyd depression and anxiety severity increased among Black Americans at significantly higher rates than that of White Americans. (https://www.pnas.org/doi/10.1073/pnas.2109139118#:~:text=During%20the%20week%20following%20Floyd's,1.67%2Dfold%20increase%20(Fig).

While this does not excuse Mr. Smith's conduct it does put the events of May 30th in the proper context. Specifically, this was an extraordinary event which is not going to occur in the future. A close examination of my client's background provides Your Honor with a deeper understanding of Anthony Smith and his contributions to the community.

The second ground for a downward variance is based on Anthony Smith's extraordinary contributions to his community.

As reflected in the report, Anthony Smith was born and raised in Philadelphia. His

family history demonstrates deep roots in the community with a long history of close

family ties. Shaped by a strong work ethic from both his parents and grandparents, Mr.

Smith demonstrated a strong sense of responsibility as a young person. The family

foundation is one of the reasons Mr. Smith has developed into a well-respected leader in his

community. Mr. Smith's parents separated when he was very young. His mother was his

primary caretaker and provided a loving and nurturing home for Anthony while growing up.

However, financial pressure on his mother forced Anthony to take on significant caretaking

responsibilities at a young age. While his mother was working Anthony was responsible for

the care of his younger sister. Anthony was a good student during his middle and high

school years, occasionally achieving honor roll status.  At the age of sixteen (16) Mr. Smith

began working at a women's clothing store. He continued to work at that same store

through college. Mr. Smith is a first person in his family to attend college. Needless to say

it was a proud moment for his parents the day he entered Arcadia University as a freshman.

Mr. Smith flourished at Arcadia as an Art Major. During his time at Arcadia Mr. Smith

spent a semester studying in China. That experience impacted him in a profound way as he

was one of very few black people in China. Mr. Smith recognized the contrast between the

racism he experienced in China with the racism he experienced growing up in the United

States. It should be noted that the time he spent in China was the only time in Mr. Smith's

life since he began working at the age of sixteen (16) that he was not employed. The only

other time Mr. Smith had time away from work was when he was incarcerated in this case

following his arrest in the fall of 2020.

As noted in the report, the murder of Michael Brown in the summer of 2014 sparked a nationwide outcry against racial injustice, particularly regarding the disparity between the treatment of African-Americans and whites by the police. Anthony developed a strong interest in civil rights and racial justice which motivated him to become involved in organizing. Mr. Smith joined the Philadelphia Coalition for Racial Economic and Legal Justice (REAL), a grassroots organization advocating for racial and economic justice.

Motivated by his desire to improve the lives of those in need, Mr. Smith began working for AmeriCorps in December 2015 at West Philadelphia High School. Mr. Smith devoted 40 hours a week to AmeriCorps while maintaining a part-time job at Banana Republic. Mr. Smith's experience at West Philadelphia High shaped his vision for the future. Colleagues quickly recognized that Mr. Smith was very effective in handling difficult students, and after approximately eighteen (18) months at West Philadelphia High School he discovered an opening as an AmeriCorps volunteer at YouthBuild Charter School. Based in North Philadelphia, YouthBuild serves students from 18 to 21 years old seeking to achieve their high school diploma. Many of YouthBuild's students have experienced incarceration or homelessness. As noted by his colleagues, Mr. Smith excelled at keeping students engaged and motivated. Highlighted in Ms. Ewing's Report is YouthBuild's commitment to restorative justice. (Exhibit 2, Mitigation Report by Maura Ewing). Restorative justice is a complex but successful approach toward conflict

resolution. Mr. Smith readily embraced the principles of restorative justice. Applying the principles of restorative justice as a facilitator with his students, Mr. Smith was extremely successful in resolving conflicts among the students. Former student and a current employee of a solar energy consultant, Jackson Kusiak writes, "Anthony taught me a great deal about restorative justice to resolve student conflict." Eventually, Mr. Smith's remarkable work was recognized as he was the recipient of the 2018 Mayor's Award for Distinguished National Service. As reflected in the character letters Anthony has had a significant impact on his community, colleagues, students and family.  (Exhibit 3)

Once the school year ended, so did the AmeriCorps program, and the position needed to be filled by a volunteer. In order to remain at YouthBuild, Mr. Smith's role shifted. Sarah Burgess, his supervisor at YouthBuild explained, that the staff felt confident that Anthony would make the transition from a student life coordinator to a teacher. Ms. Burgess stated, "We saw his potential as an educator given how much he cared about young people and how excited they were to be around him." She further noted that, "He (Anthony) is so community-minded and has a lot of passion for the work in connecting our students to service opportunities"

In the fall of 2018, YouthBuild hired Anthony Smith to be a social studies teacher. Over the past four years Mr. Smith has become a valued member of YouthBuild, earning the love and respect from colleagues and students. Ms. Burgess stated that Anthony is exceptionally good at expanding the critical thinking skills of his students and that "the

students love him."

   In 2021, the students voted Anthony Smith "Teacher of the Year." One of his students, Melanie Osborne, wrote, "I struggle with social anxiety, so it has been hard to stand my ground and say what's on my mind. Through Mr. Ant's class, I learned to speak my mind in a way that is non-confrontational." Melanie, who had dropped out of school at 16, struggled with mental health issues. With the help of Anthony Smith and others at YouthBuild Melanie graduated at the top of her class and is currently working toward an Associate's degree in Psychology at the Community College of Philadelphia. Melanie attributes her successful transformation to Anthony Smith noting that "Mr. Ant is a role model. For him to hear my opinions and take them seriously about ways to change issues going on in the world gave me confidence. And it gave me hope to maybe one day see change in our city because of people like Mr. Ant."

   This criminal conviction has destroyed Mr. Smith's future as a teacher in public and charter schools. The impact is devastating, not only on this remarkable young man, but on the YouthBuild community as well. As Ms. Burgess stated, "I feel an urgent need to communicate to you what an inspiring, dedicated and beloved person Anthony Smith is, and how much of a positive impact he has on all of those around him."

 (Exhibit 3 page 14).

   Alex Kenner, a friend of more than ten years and Anthony's former classmate at

Arcadia University notes, "No one is more dedicated to social justice." Powerful testimonials are provided in the letters from former classmates at Arcadia University, Jasmine Parnell-Peaks, Assistant Professor of Biology at Lincoln University, Alex Rodriguez, a licensed clinical social worker, Jossiah Whack, and Amber Williams, Director and Advisor at UPenn. These testimonials offered by his former college classmates reveal Anthony's true nature as a positive inspirational person.

Equally impressive are the relationships Anthony developed among likeminded, dedicated community volunteers. The following individuals offered letters on behalf of Anthony:

In her letter, Aathira Chennat, Program Coordinator with Twelve Gates Arts program in Philadelphia and a co-volunteer with the food distribution network writes "Anthony's presence and leadership are a vital community resource." The sentiment that Anthony is both a leader and essential to his community is a common theme in the letters by fellow community activists and volunteers. These include letters from Robert Saleem Holbrook, Krystal Strong, Assistant Professor of Black Studies and Education at Rutgers University, Lila Bhide, founder of Penn Food and Wellness Collaborative at University of Pennsylvania.

Ms. Bhide remarked that Anthony "leads by example and has taught me what it means to be a truly empathetic, selfless, compassionate, person. He is an asset to his family and his community and is a person who pours his heart and soul into improving the world

around him." Others who write about his deep commitment to his volunteer work are Janielle Bryan, Director of Community Wellness for the 11th Street Services, Hannah Thompson, Jeeva Muhil of the Philadelphia Asian Pacific American Labor Alliance, AFL-CIO, Johana Rahman, Kempis Songster, Asantewaa Nkrumah-Ture, Kitty Heite, Rufus Farmer, and the Green Party of Philadelphia, among others. City Councilmember Jamie Gauthier lauded Mr. Smith's community commitment in her letter. "Anthony inspires other members in my district and residents at large in Philadelphia to play a more prominent role in providing basic needs for their neighbors."

Nowhere is Mr. Smith's commitment to enhancing the community more evident than in his work as a teacher at YouthBuild. As reflected in the numerous character letters provided by his YouthBuild colleagues, Anthony has firmly established himself as an inspirational leader to the young people he encountered while teaching at YouthBuild.

Scott Emerick, Executive Director of YouthBuild noted that in August of 2018, Anthony Smith received the AmeriCorps and the Corporation for National Community Service National Full-Time AmeriCorps Member of the Year Award for his leadership. Anthony's supervisor, Sarah Burgess wrote that she is "deeply inspired by Anthony's ability to give his best at school. His extraordinary effort to engage these students at this vulnerable time in their young adult life is remarkable." The impact of Anthony Smith's inspirational leadership is further reflected in the letters submitted by his co-workers, Franci Rocchi, Kali Thomas, Michael Noel, Joey Cohen, PhD, Harry Salmond, Anna

Latshaw, Richard Chalme, Erica Gadsby Smith, and Erika Celley.

In addition to the network of fellow community volunteers and colleagues at YouthBuild, Anthony's character and selflessness is revealed in the numerous letters written by close friends Deandra Jefferson, Cindy Lou Miller, Tina Furr, Gabe Bryant, Alyssa King, Sonalee Rashatwar, YahNe Ndgo Baker, Imrul Mazid, Samantha Pinto, and Rebecca Wanner.

Anthony Smith has been an outspoken advocate against police violence experienced by the black community. Mr. Smith has helped raise public awareness regarding the unjust treatment received by black and brown communities, specifically, by the Philadelphia Police. The decision by Mr. Smith to place a piece of cardboard into a flaming vehicle is not reflective of his true nature. The cartoon cited by the government was not created by Mr. Smith, but rather a re-post on his social media account, and once again, are not indicative of his peaceful nature and the positive work in the community. The testimonials in the letters from friends, co-workers and supporters offer the true reflection of Anthony Smith's character.

Anthony Smith is now barred from teaching for ten (10) years pursuant to Title 24 of the Pennsylvania School Code Section 1-111. However, as reflected in the Mitigation Report, and the letter from Shanee Garner, Executive Director for "Lift Every Voice Philly," a non-profit that supports parents to advocate for stronger public schools, Mr. Smith has two strong employment opportunities. (Exhibit 3 page 80).

The Mitigation Report and attached character letters demonstrate that Anthony Smith was a transformational educator and inspirational community leader, providing inspiration to a vulnerable group of at-risk youth seeking a better future. Anthony Smith has been punished. As a result of this conviction, Mr. Smith is barred from teaching in public and charter schools for ten years. In addition, he has demonstrated that he is a great candidate for probation as he was under house arrest for more than two and a half years without a single violation. Based on the Presentence Report, the numerous character letters, and the Mitigation Report, the conduct by Anthony Smith on May 30, 2020 was an aberration and does not reflect his true character. In addition, those same documents demonstrate Mr. Smith's decade long commitment to enhancing the community. Each of these grounds serve as separate basis for this Honorable Court to apply a downward variance, and taken in combination justify a significant downward variance from the guidelines. For the reasons set forth above, I respectfully request that Your Honor impose a non-incarceration sentence.

**B.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

There is no question that the criminal conduct engaged in by Mr. Smith is serious and that respect for the law must be a consideration in determining a just punishment. In the process of making the determination of what constitutes a just punishment we cannot overlook the significant impact that lengthy periods of incarceration have on defendants'

families and communities. More significantly, the fact that the Federal Sentencing

Guidelines fails to incorporate the long-term detrimental impact that lengthy federal

sentences have on society necessitates the development of a new educated perspective.

According to Marie Gottschalk, the criminal justice system, more specifically, the

penal system, has become one of the causal shaping forces in our society. Democracy in the

Carceral State in America, Detaining Democracy Criminal Justice in American Civil Life,

Volume 651, pp. 288-295, January, 2014. The unduly harsh sentences that have historically

plagued the criminal justice system over the past fifty years has been addressed in a several

different contexts.

The social science that has established that long term incarceration is detrimental to

the individual and the community supports a new approach to the sentencing paradigm. In a

study conducted more than twenty years ago, researchers concluded that the longer an

individual is incarcerated, the more likely it is that the individual will commit a future

crime. In *The Effects of Prison Sentences on Recidivism*, securitepublic.gc.cc.1999, Paul

Gedreau, Claire Gogin and Frank

The essential conclusions from this study were:

1.    Prisons should not be used with the expectation of reducing criminal
      behavior.

2.    On the basis of the present results, excessive use of incarceration has
      enormous cost implications.

3.    In order to determine who is being adversely affected by prison, it is

incumbent upon prison officials to implement repeated, comprehensive assessments of offenders' attitudes, values, and behaviors while incarcerated.

4.    The primary justification of prison should be to incapacitate offenders

(particularly, those of a chronic, higher risk nature) for reasonable

periods and to exact retribution. (p. 1-2)

Even if imprisonment does not change an offender for the worse, it may affect society's response to him, making it more difficult for him to find stable employment, secure suitable housing, or reconcile with his family. The absence of these informal social controls and strong social bonds may make it easier for the offender to resume drug use or return to a life of crime. Sampson and Laub (1993) take a similar position, arguing that imprisonment weakens offenders' social bonds and reduces their social capital. As they note, arrest and imprisonment lead to the "knifing off" of opportunities to participate in conventional social life." p. 350-351

Over the past two decades social science has offered significant insight into the efficacy of lengthy periods of incarceration in this struggle to achieve a "just result."

During that same time period social scientists were in general agreement that long periods of incarceration did not achieve the desired impact. Writing for the American Criminal Law Review, Professor Ian Weinstein reinforces this general consensus. Addressing the mandatory sentencing paradigm, Weinstein asserts that mandatory minimum statues have created a shift in the power toward the prosecutor so extreme that it

has damaged the adversary system and brought injustice. (See *FifteenYears After Federal Sentencing Revolution: How Mandatory Minimums have Undermined Effective Injustice in Narcotics Sentencing*" Ian Weinstein, Fordham University School of Law, American Criminal Law Review, Volume 40:87

http://ir.lawnet.fordham.edu/cgi/viewcontent.cgi?article=1416&context=faculty_scholarship)

Written almost a decade and a half ago, this study made it clear that the overwhelming majority of criminal justice experts agreed that harsher sentences fail to either provide greater public safety or reduce crime. (Footnote 178) The author asserts that "we are imprisoning people for many years and destructing lives and families while gaining nothing. The current allocation of authority prevents discussion of the severity of these sentences. After all, when mitigation is largely in control of the prosecutor, it makes little sense to mount a funneled challenge to the harshness of the sentence and there is really nowhere to take the complaint. The current regime of overcriminalization increased prosecutorial discretion and very harsh sentencing reinforces itself." (Page 130-131) The author concludes that "someday many more Americans will look back and ask how we could lock up so many people for so long for such crimes. (Page 132) Professor Weinstein's predictions are prophetic. Unfortunately, only now, almost twenty years after the Supreme Court's decision in United States v. Booker, are we coming to the realization that the winds of change are bending towards a more just and reasonable sentencing landscape.

Providing further support to the conclusion by social scientists that longer periods of incarceration are detrimental to society is the recognition that eventually, individuals age out of criminal conduct as a result of the process of maturation. Researchers John H. Laub and Robert J. Sampson concluded "From apolicy standpoint, the message is that change is possible, and therefore, it is critical that individuals are given the opportunity to reconnect to institutions like family, school, and work after a period of incarceration or any criminal justice contact for that matter." Understanding Desistance From Crime, Crime and Justice Vol. 28, 1, p.58

(https://dash.harvard.edu/bitstream/handle/1/3226958/Sampson_UnderstandingDesistance.pdf?sequence=4)

These studies support the general contention that longer periods of incarceration have a destructive impact on an individual's chances at rehabilitation.  Given Mr. Smith's compelling mitigation and commitment to improving his community, a period of incarceration is not consistent with achieving the desired result, a fully rehabilitated, productive member of society. Incarcerating Anthony Smith would not provide just punishment based on an extraordinary moment in time, for a young man that has lost his job as a teacher, a career that was his passion.

**C.    The Guidelines and Policy Statements Issued by the Sentencing Commission and the Needto Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records who have been Found Guilty of Similar Conduct.**

Based on the extraordinary and compelling mitigation in this case a

probationary sentence for Mr. Smith, would not create unwarranted sentence disparities among Defendants with similar records who have been found guilty of similar conduct.

**D.    The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant.**

A sentence of probation will afford adequate deterrence to criminal conduct as Mr. Smith has demonstrated for more than three years through his actions, and supported by letters submitted on his behalf, that he will not commit another crime and is an exemplary candidate for probation.

**E.    The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.**

Mr. Smith does not need educational or vocational training. Mr. Smith has demonstrated that he has done everything expected to chart a path toward rehabilitation.

**VI. CONCLUSION**

Wherefore, on behalf of my client, I respectfully request that your Honor permit Mr. Smith to continue his exemplary path toward rehabilitation by imposing a sentence of non-incarceration.

Respectfully submitted,

/s/ Paul J. Hetznecker, Esquire
Paul J. Hetznecker, Esquire
Attorney for Defendant, Anthony Smith

Date:  November 21, 2023

## CERTIFICATE OF SERVICE

I, Paul J. Hetznecker, hereby certify that a true and correct copy of defendant's

Sentencing Memorandum was served on the following via the Court's electronic filing

system (ecf):

**Amanda Reinitz, Esquire**
**Assistant United States Attorney**
**615 Chestnut Street, Suite 1250**
**Philadelphia, PA 19106-4476**


/s/ Paul J. Hetznecker, Esquire
Paul J. Hetznecker, Esquire
Attorney for Defendant, Anthony Smith

Date: November 21, 2023